United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>EDGAR DIAZ, RICKEY ROLLINS,<br>DON JOHNSON, ROBERT CALLOWAY,<br>DORNELL ELLIS, EMILE FORT,<br>CHRISTOPHER BYES, PARIS<br>RAGLAND, RONNIE CALLOWAY,<br>ALLEN CALLOWAY, TERRELL JACKSON<br>and REDACTED DEFENDANT NO. ONE,<br><br>Defendants.<br>_____/ | No. CR 05-00167 WHA<br><br>**ORDER DENYING MOTIONS TO EXCLUDE DRUG IDENTIFICATION EXPERT TESTIMONY FOR LACK OF FOUNDATIONAL MATERIALS** |

**INTRODUCTION**

In this criminal street-gang prosecution, defendants seek to exclude drug-identification expert testimony. A prior order dated December 6, 2006, granted in part and denied in part defendants' motions to exclude the expert testimony under *Daubert* and Federal Rule of Evidence 702. This order addresses issues related to the San Francisco Police Department Crime Lab's narcotics-analysis documentation and the destruction of some of the suspected narcotics evidence in this case. For the reasons stated below, defendants' motions to exclude the evidence based on these foundational defects are **DENIED**.

**STATEMENT**

The government revealed in its expert disclosure summaries that it intended to call seven analysts from the SFPD Crime Lab. The expert disclosures explained that the analysts performed testing on suspected narcotics as part of the investigations against defendants. According to the disclosures, each analyst did "not have an independent recollection of the analyses in this case, but . . . follow[ed] the standard method used by the SFPD Crime [Lab]." The disclosures incorporated by reference the SFPD Crime Lab's Standard Operating Procedures ("SOP") manual for the identification of controlled substances. Finally, each expert disclosure listed the case number and result for each substance tested. For example, the expert disclosure for Francis Woo stated:

> In SFPD case 031005607, (Lab Report Number 209299), Criminalist Woo will testify, in addition to what is contained in his report (N00346), to the following: that, on 8/26/03, he performed various tests in order to determine whether the 2 off-white colored rocks individually wrapped in plastic were cocaine base; that the testing revealed that the 2 off-white colored rocks were cocaine base; and that the total weight of cocaine base was 0.46 grams.

Each test corresponded with a positive match for either cocaine or marijuana.

**ANALYSIS**

Defendants contend that the documents provided by the government are insufficient to lay a proper foundation for the drug-identification experts. Defendants focus on a number of factors in support of their claim, specifically, "the destruction of the drugs, the destruction of the analyst's working papers, the analyst's claimed lack of recollection of the testing procedure, the ambiguities of the SOP, and conclusory reports" (Diaz Reply Br. 2). Defendants contend that these conditions require the exclusion of the expert testimony. This order disagrees. Although some of the deficiencies noted by the defense may be brought to the jury's attention

1  during trial, there is an insufficient basis at this juncture for the wholesale exclusion of the
2  drug-identification testimony.[1]

### 1.  ADMISSIBILITY OF NARCOTICS-ANALYSIS WORKSHEETS.

During the analysis of the suspected narcotics in this case, the SFPD Crime Lab analysts filled in narcotics-analysis worksheets to note what tests they performed on the suspected narcotics. Although the form of the worksheets changed during the relevant period (June 1998 through May 2005), the basic information the worksheets required was the same. The analyst indicated his or her name, the applicable case number, and a date of receipt. The analyst also wrote down the weight of the sample, the tests performed, and whether the tests were positive for narcotics. Finally, for the samples relevant to the instant motions, the analyst indicated a positive result for either cocaine or marijuana (DX 7 Tab 36).[2] At the hearing, SFPD analyst Deborah Madden testified that these worksheets were filled out while the tests were being conducted.

The government seeks to admit the information in the narcotics-identification worksheets under the past recollection recorded exception to the hearsay rule. The government has not addressed whether other exceptions such as the business-records exception or public-records exception would apply. In *United States v. Marshall*, 532 F.2d 1279, 1285 (9th Cir. 1976), the Ninth Circuit upheld a district court's decision to admit a chemist's report identifying

---

[1] The "ambiguities" of the SFPD Crime Lab SOPs were addressed in the December 6 order. That order explained that the SOPs and practices in effect during the relevant period passed muster under *Daubert* because they were sufficiently similar to the procedures generally accepted by the forensic science community. Moreover, an adequately trained and experienced analyst would not consider the SOPs and practices too vague or ambiguous. Accordingly, to the extent defendants' motions attack the foundation of the experts' testimony because of ambiguities in the SOPs, those arguments lack merit (Dec. 6 Order at 12–15, 19–21, 28–29).

The December 6 order also found that the worksheets were not too conclusory under *Daubert*. "This order finds that although these worksheets were conclusory, they documented (1) the tests the analyst performed, and (2) the analyst's conclusions from those tests. . . . [T]he fact that the worksheets did not contain documentation of the precise observations of the analyst does not mean that the analyst did not perform the tests or did not actually observe the crystal shapes or botanical features. Although more detailed documentation would be preferable, the mere fact that the analysts' reports are cursory is not a basis for exclusion under *Daubert*" (*id.* at 22).

[2] "DX" refers to defense exhibits.

a white powder as cocaine. Even though the police chemist "testified that he did not have any independent recollection of the tests he performed," the Ninth Circuit held that the report was admissible under Rule 803(5) as a past-recollection recorded. Rule 803(5) provides:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> (5) Recorded recollection. A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness' memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

The expert disclosures here explain that although the analysts do not now have an independent recollection of the tests they performed, they followed SFPD Crime Lab procedures. Those procedures were embodied in various Controlled Substances SOPs and practices followed during the relevant period. Each of the relevant SOPs have been provided. Moreover, it is clear from the narcotics-analysis worksheets which tests were performed on the samples at issue. This order holds that Rule 803(5) will apply to the reports prepared in the instant case, as long as the government can prove that: "(1) the witness once had knowledge about the matters in the document, (2) the witness now has insufficient recollection to testify fully and accurately, and (3) the record was made or adopted by the witness at a time when the matter was fresh in the witness' memory and reflected the witness' knowledge correctly." *United States v. Collicott*, 92 F.3d 973, 984 (9th Cir. 1996). In this case it is important that the government establish that, if the analyst cannot specifically recall performing the tests at issue, the analyst followed the appropriate procedures during the period in question.[3]

---

[3] Moreover, admitting this evidence would not, as defendants contend, violate defendants' rights under the Confrontation Clause. The Ninth Circuit has held that Rule 803(5) "does not involve any deprivation of the right of confrontation as the Sixth Amendment has been interpreted and construed." *See Marshall*, 532 F.2d at 1285. Defendants' reliance on *Crawford v. Washington*, 541 U.S. 36, 68 (2004), is misplaced. *Crawford* held that "[w]here testimonial evidence is at issue . . . the Sixth Amendment demands . . . unavailability and a prior opportunity for cross-examination." Here, the analysts who prepared the worksheets will be available to testify at trial. Defendants' rights under the Confrontation Clause will not be violated.

Note well that the rule bars introduction of the reports themselves (except at the adverse parties' insistence) and allows it only to be read to the jury.

Defendants cite *United States v. Martin*, 984 F.2d 308 (9th Cir. 1993), to support their contention that the reports here should be excluded. In *Martin*, the district court revoked a defendant's supervised release because two laboratory urinalysis reports showed the presence of methadone and cocaine metabolites. The Ninth Circuit reversed the revocation because the district court had considered the reports based on the testimony of a counselor at the defendant's rehabilitation facility. The counselor had no knowledge of the urinalysis-testing procedures. The Ninth Circuit also found significant that the district court denied the defendant's request to retest the samples, when the samples were still available for testing. *Martin*, 984 F.2d at 309–10, 311, 313.

*Martin* is distinguishable for two reasons. *First*, in *Martin*, the counselor had no knowledge of the testing procedures employed on the samples. The counselor was also unable to shed any light on chain-of-custody issues. The Ninth Circuit found it problematic that a person unfamiliar with the procedures was testifying about a report compiled by a specialist. There is no similar problem here. In this case, the proffered experts performed the tests themselves and were (and are) experienced narcotics analysts.

*Second*, the sample tested in *Martin* was still available for testing by the defendant. The district court there, however, had denied the defendant's request to retest the sample. The Ninth Circuit held that "[t]he more significant particular evidence is to a finding, the more important it is that the releasee be given an opportunity to demonstrate that the proffered evidence does not reflect 'verified fact.'" *Id.* at 311. Here, according to the government, only five of the fourteen samples at issue have been destroyed. With respect to the samples that do remain, they are available to defendants' experts for retesting. With respect to the others, the first difference is sufficient.

5

For the foregoing reasons, assuming a proper foundation is laid, the narcotics-analysis worksheets may be read to the jury under Rule 803(5), subject to the limitations of the December 6 order. During the *Daubert* hearing, the defense noted that not all of the narcotics-analysis worksheets had the proper notations required by the SOPs. This issue may be raised during cross-examination of the drug-identification experts. This ruling is without prejudice to considering the worksheets' admissibility under other rules of evidence.

### 2. ADMISSIBILITY OF CABLE PRINTOUTS.

A more troubling question is presented for two of the samples in this case. For those two samples, the suspected narcotics were destroyed and the laboratory worksheets were either lost or destroyed. All that remains are cursory "CABLE" printouts. The CABLE database was (and is) a computer system that enabled SFPD officers to track the results of forensic tests of evidence. For suspected narcotics, the CABLE database only kept track of: (1) the incident and laboratory numbers; (2) the date and time the sample was received by the SFPD Crime Lab; (3) the name of the analyst who performed the tests; (4) the result of the test, *i.e.*, "marijuana" or "cocaine base"; (5) the weight of the sample; and (6) whether or not the sample was destroyed. The CABLE printouts did not indicate what tests were performed on the suspected narcotics (DX 7 Tab 36).

At the *Daubert* hearing, Madden testified that the analyst who performed the tests was the same analyst who input the data into the CABLE database. The analyst did not, however, enter the information *while* he or she performed the drug-identification tests. Generally, analysts would input the data the same day the tests were performed, but sometimes several hours later. For each CABLE database entry, a supervisor would perform an "administrative review" to ensure that the information entered corresponded with the analyst's conclusions indicated on the narcotics-analysis worksheets.

This order holds that the CABLE printouts might be admissible under Rule 803(5). The record, however, is insufficient to establish whether each CABLE printout "was made or

6

adopted by the [analyst] at a time when the matter was fresh in the [analyst's] memory and reflected the [analyst's] knowledge correctly." *Collicott*, 92 F.3d at 984. The government must lay a proper foundation for the CABLE printouts under Rule 803(5). For these printouts, it will be especially important for the government establish: (1) whether it was the same analyst or a different analyst who input the data into the CABLE database; (2) whether the data was entered while the tests and results were fresh in the analysts' memory, rather than a rote repetition of the narcotics-analysis worksheets; (3) whether the analysts input the data on the same day they conducted the tests; and (4) whether the analyst can establish through competent evidence the specific tests and specific results used and obtained.

It is also troubling that the CABLE printouts do not indicate what tests were performed on the suspected narcotics. It might be that, based solely on a CABLE printout, the testifying expert will not be able to recall what tests he or she performed on the sample. If the analyst cannot remember the tests that were performed as a matter of practice and custom, he or she will not be permitted to render an opinion about the chemical composition of the samples.

This order does not hold that the printouts or information therein are admissible. It only holds that a wholesale exclusion is not justified on this record. A final ruling must await the full foundational record to be supplied. This will need to be done analyst by analyst. Each analyst will need to reconstruct what his or her practices were and how invariable those practices were with respect to completing the CABLE entries. This order cannot rule out the possibility that, considering the foundational problems of the CABLE printouts, their probative value might be outweighed by unfair prejudice to defendants, waste of time in bringing out the foundational defects through cross-examination, and other considerations under Rule 403.

**3. DESTRUCTION OF SUSPECTED NARCOTICS EVIDENCE.**

As to the samples in this case that were destroyed, the government has represented that those samples were destroyed according to SFPD Crime Lab policy. The Ninth Circuit has held that such loss is not fatal to the government's proffer:

7

> When criminal evidence is lost or destroyed, the court's principal concern is whether the defendant can have a fair trial even though he is not able to examine all the relevant evidence. A balancing approach is used to make that determination. We consider the government's conduct in connection with the loss or destruction of the evidence and the prejudice to the defendant, most importantly, whether the evidence that was adduced at trial was sufficient to sustain the conviction.

*United States v. Traylor*, 656 F.2d 1326, 1334–35 (9th Cir. 1981) (citations omitted). In *Traylor*, the destruction of drug evidence was not sufficient to justify a reversal of the defendant's conviction. Defendants here have not alleged that the destruction of the evidence was the result of bad faith on law enforcement's part. *See Arizona v. Youngblood*, 488 U.S. 51, 58 (1988) ("We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.").

Evidence adduced at the *Daubert* hearing revealed that the SFPD has a policy of destroying narcotics if the District Attorney's office notifies the SFPD that the District Attorney either has prosecuted or will not prosecute based on the suspected narcotic. This order finds significant that, as in *Traylor*, "the decision to destroy the evidence was made by the state and not by any federal authority." *Traylor*, 656 F.2d at 1335. While it is conceded that defendants will suffer prejudice because independent testing of the substances will not be possible, that prejudice can be overcome by probative and reliable "secondary evidence adduced at trial." In *Traylor*, that secondary evidence was the chemist's testimony that "he had run four different tests on the substance before concluding that it was about 45 percent cocaine" and counsel's opportunity to "conduct[] an extensive cross-examination of the chemist regarding those tests."

This order will follow *Traylor*. "While having the [suspected narcotics] available for testing by . . . defendant[s] would [be] the ideal situation, [defendants will not be] denied a fair

8

trial because of the loss of the [suspected narcotics]." At trial, however, defendants will be permitted to bring the fact of the destruction to the jury's attention.[4]

## CONCLUSION

For the foregoing reasons, the motion to exclude on a wholesale basis is **DENIED**. This does not mean the evidence is automatically to be admitted. The proper foundation, item by item, must be laid.

Finally, to the extent this order and the December 6 order do not address all of the issues raised by defendants in their briefs and at the hearing, those issues are left to possible cross-examination subject to the usual limitations under Rule 403.

**IT IS SO ORDERED.**

Dated: December 12, 2006

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

---

[4] Defendants rely on *United States v. Pierre*, 47 F.3d 241, 242–43 (7th Cir. 1995), which is distinguishable from the case at bar. In *Pierre*, the defendant contested the revocation of his probation, which had been based on repeated positive tests for cocaine in his urine. The district court revoked the defendant's probation based on the government's proffer of written documentation of the urinalysis laboratory's testing and chain-of-custody forms. On appeal, the defendant argued that the government bore the entire burden of proving its case, and that the government should have introduced "live testimony," rather than mere written documentation. Affirming the district court, the Seventh Circuit conceded that the defendant's strategy was "understandable." In so conceding, the Seventh Circuit stated:

> What was the technician going to say on the stand? One vial of urine looks like another; the technicians would not have remembered what they did with Pierre's specimens and therefore would have described their normal procedures, and the judge would not have been enlightened. A court cannot resolve scientific controversies by looking witnesses in the eye; the question is not whether a technician believes the tests accurate but whether they *are* accurate.

It is this quotation upon which defendants rely. But the *Pierre* court did not stop there. The court held that it was up to the defendant to call the reliability of the laboratory's results into question. Specifically, the defendant could have "procure[d] subpoenas for either the technicians or the head of the laboratory." The defendant there failed to do so, and thus failed to invoke the district court's gatekeeping duty under *Daubert*. Finding no evidence that the procedures used by the urinalysis laboratory were unreliable, the Seventh Circuit affirmed the probation revocation. Unlike the defendant in *Pierre*, defendants here have questioned the reliability of the SFPD Crime Lab's procedures. This Court has determined that the methods used were, on the whole, reliable for *Daubert* purposes. The quoted dicta from *Pierre* is inapplicable to the instant case.