UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. 05-cr-00167-WHA-5 |
| v. | |
| DON ALONZO JOHNSON, | **ORDER RE MOTION FOR COMPASSIONATE RELEASE** |
| Defendant. | |

Don Alonzo Johnson, thirty-five, moves under 18 U.S.C. § 3582(c)(1) to modify his original twenty-three-year sentence to time served (approximately sixteen and one-half years). For the reasons that follow, the motion is **GRANTED.**

The events underlying this case occurred between 2004 and early 2005. At those times, Mr. Johnson was 18 and 19 years old, *i.e.* a "youthful offender." *See* U.S. SENT'G COMM'N, YOUTHFUL OFFENDERS IN THE FEDERAL SYSTEM, 5 (May 2017), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170525_youthful-offenders.pdf. In 2006, Mr. Johnson pled guilty to one count of conspiracy to participate in a Racketeer Influenced and Corrupt Organization (RICO). In his plea agreement, he admitted to conspiracy to commit murder; conspiracy to distribute crack cocaine and marijuana; and conspiracy to commit other crimes. He admitted to committing all conduct in furtherance of a gang and his position in that gang. He was sentenced in March 2007. The Bureau of Prisons

(BOP) has denied him relief, so jurisdiction lies with the district court. This order follows full briefing and several hearings by telephone (Thompson Decl. Exh. C; PSR ¶ 59; Dkt. No. 1201).

Under 18 U.S.C. § 3582(c)(1)(A), a district court may modify a term of imprisonment:

> upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of [the BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier.

In determining whether to modify a term of imprisonment, a district court must consider the factors in 18 U.S.C. § 3553(a) and find that "extraordinary and compelling reasons warrant such a reduction," "and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." Our court of appeals recently found in *United States v. Aruda*, 993 F.3d 797 (9th Cir. 2021), however, that no policy statement from the Sentencing Commission currently applies.

Since the applicable policy statement lapsed, courts have found extraordinary and compelling reasons not named in the policy statement, including a defendant's youth and lack of maturity. Courts have also cited evolving research and law on this topic. For instance, the Tenth and Fourth Circuits Courts of Appeals have approved a finding of "extraordinary and compelling reasons" when the district court exercised discretion to consider the defendant's "young age at the time of sentencing," among "a combination of factors." *United States v. Maumau*, 993 F.3d 821, 837 (10th Cir. 2021). *See also United States v. McCoy*, 981 F.3d 271, 274 (4th Cir. 2020); *United States v. Herrera-Genao*, 2021 WL 2451820, at *8 (D.N.J. June 16, 2021) (Judge Anne E. Thompson); *United States v. Ramsay*, 2021 WL 1877963, at *15 (S.D.N.Y. May 11, 2021) (Judge Jed S. Rakoff) (discussing the science of developing brains at length). This order acknowledges, too, that the Sixth Circuit Court of Appeals has held that conditions known at sentencing (like age) cannot provide an extraordinary and compelling reason. *See United States v. Hunter*, 12 F.4th 555, 571 (6th Cir. 2021).

2

While being a youthful offender has been a point of solicitous concern for the courts, since 2007 we've come to better understand the neurological differences in young brains that can drive youthful crime. This order finds that Mr. Johnson's extraordinary rehabilitation while incarcerated, in combination with broader recognition of how young brains differ from adult brains, constitute extraordinary and compelling reasons to reconsider his sentence.

Consistent with the science, Mr. Johnson's disciplinary history from the BOP shows decreasing seriousness over time, with a total drop off after 2012. His earlier transgressions included crafting an unsuccessful plan to have a friend bring tobacco and rolling papers into the prison (2009); missing a GED class (2011); and consuming alcohol and separately using another inmate's pin for a phone call (2012). After 2012, he had no violations. Meanwhile, Mr. Johnson has completed at least 1,197 hours in approximately seventy educational courses. He has taken the GED exam twice and passed three of four subjects each time. He continues to study in order to retake it. He has worked consistently throughout his time in the BOP as an orderly, in janitorial services, and in meal preparation, among others (Johnson Decl. ¶¶ 33–37). He has glowing reviews from supervisors and teachers (*see* Thompson Decl. Exhs. H, J, K, I).

Following Mr. Johnson's sentencing in March 2007, the Supreme Court emphasized the need for "individualized" sentencing when youth commit serious offenses. *See Graham v. Florida*, 560 U.S. 48, 79 (2010) (juveniles cannot be sentenced to life without the possibility of parole for non-homicide crimes). Then, in 2012, another Supreme Court decision stressed that important developments in science had emerged since *Graham*. *See Miller v. Alabama*, 567 U.S. 460, 472 (2012) (no mandatory life-without-parole sentences for juveniles who commit homicide). That is, critical new science emerged *after Mr. Johnson's sentencing*. For instance, *Miller* held, "Numerous studies post-*Graham* indicate that exposure to deviant peers" contributes to crime among young people. *Id*. at n. 5 (quoting J. Lawrence Aber, *et. al.* as *Amici Curiae*, 26–27 (2012); *see also* Leah Somerville, *et al*. *Frontostriatal Maturation Predicts Cognitive Control Failure to Appetitive Cues in Adolescents*, 23 J. COGNITIVE NEUROSCI. 2123, 2123–24 (2011); Lawrence Steinberg, *A Dual Systems Model of Adolescent Risk-Taking*, 52 DEVELOPMENTAL PSYCHOBIOLOGY 216, 216–217 (2010); Bernd Figner et al.,

3

*Affective and Deliberative Processes in Risky Choice*, 35 J. EXPERIMENTAL PSYCHOL. 709, 710 (2009).

Since *Miller*, a broader recognition of the importance of the Adverse Childhood Experiences Study (ACES), has also greatly affected our understanding of crime among young adults. Research into ACES has shown that greater traumatic experiences in childhood correspond with riskier behavior and a greater likelihood of involvement in the criminal legal system. *Our own probation department now submits ACES evaluations in presentence reports* (an evaluation missing from Mr. Johnson's probation report). ACES has general applicability for adults but has particular salience for understanding youth behavior. *See, e.g., ibid.*; Bryanna Hahn Fox, et. al., *Trauma changes everything: examining the relationship between adverse childhood experiences and serious, violent and chronic juvenile offenders*, 46 CHILD ABUSE NEGL. 163-73 (Aug. 2015); *see also* Merrick MT, et. al., *Prevalence of Adverse Childhood Experiences From the 2011-2014 Behavioral Risk Factor Surveillance System in 23 States*, 172 JAMA PEDIATR. 1038–44 (2018).

This reasoning, moreover, is not limited to minors. Effective November 2010, the sentencing commission added to Section 5H1.1 of the sentencing guidelines, "***Age (including youth) may be relevant*** in determining whether a departure is warranted, if considerations based on age, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." That addition replaced this sentence: "***Age (including youth) is not ordinarily relevant*** in determining whether a departure is warranted." U.S. SENT'G COMM'N, GUIDELINES MANUAL: AMENDMENT 739, https://guidelines.ussc.gov/ac/739 (emphasis added).

Furthermore, in 2017, the United States sentencing commission produced its first report on "youthful offenders." U.S. SENT'G COMM'N, YOUTHFUL OFFENDERS IN THE FEDERAL SYSTEM, *supra*, at 2. The commission explained that brains continue to develop until approximately age twenty-five, and that developmental differences relevant to sentencing generally persist until around that age. *Id.* at 5. In yet another example, California now grants

4

a "youth offender parole hearing" to one who received a maximum (including life) sentence if that person committed the offense at ages eighteen to twenty-five. *See* Cal. Pen. Code § 3051.

This order recognizes that 28 U.S.C. § 944(t) prohibits the sentencing commission from issuing a policy statements that says rehabilitation "alone" can constitute an extraordinary and compelling reason. Section 944(t) does not facially bind the district court, but nevertheless this order does not rely on rehabilitation alone.

As the Supreme Court has held, characteristics "of transient rashness, proclivity for risk, and inability to assess consequences" among youth, "both lessen[] a child's 'moral culpability' and enhance[] the prospect that, as the years go by and neurological development occurs, his 'deficiencies will be reformed.'" *Miller*, 567 U.S. at 472–73 (cleaned up). While a 2007 order imposed a twenty-three-year sentence agreed upon by the parties, the greater recognition of differences in young brains, along with Mr. Johnson's demonstrated rehabilitation, means that today's order can better set a "graduated and proportioned" punishment for Mr. Johnson, consistent with the Section 3553(a) factors. *Id.* at 469 (cleaned up); (Dkt. No. 1207, Exh. A). (Having found extraordinary and compelling reasons, this order therefore does not decide whether Mr. Johnson's medical conditions — chronic asthma, chronic bronchitis, and chronic allergic rhinitis — combined with COVID-19, rise to the level of extraordinary and compelling reasons.)

\*    \*    \*

This order next turns to the Section 3553(a) factors:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the

5

>> defendant; and
>
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established . . . [in] the guidelines . . . .

On balance, these factors favor release.

*First,* Mr. Johnson pled to one count of RICO conspiracy in a gravely serious case. Charges against him included two counts of murder in aid of racketeering and two counts of armed assault in aid of racketeering. He admitted to aiding and abetting a murder that took place in the Sunnydale Housing Projects. He opened fire (along with another) on a vehicle. Several times, he (along with others) opened fire on members of another gang (PSR ¶¶ 62–66).

Alongside this very serious conduct, Mr. Johnson's history also includes experiencing his father's physical abuse of his mother; exposure to community violence (including getting severely "jumped" as a child); his father's incarceration in Texas; his father's drug addiction; and the fact that his father likely suffered from bipolar disorder and "reportedly" committed suicide in 2004. As discussed, Mr. Johnson's efforts to rehabilitate himself through education, work, and programming inside the BOP also impress. Today, Mr. Johnson's history and characteristics tip this factor in favor of a reduced sentence (PSR ¶¶ 145, 147, 152).

*Second* and *third,* the underlying crime required a very substantial sentence in order to reflect the gravity of Mr. Johnson's conduct and to deter others. But Mr. Johnson has served heavy time, approximately sixteen and one-half years or more than 70%, of his original sentence (some of it "hard time" due to the pandemic). This factor is evenly-balanced.

*Fourth* and *fifth*, Mr. Johnson's level of current threat requires consideration of four factors under 18 U.S.C. § 3142(g)(1)–(4): (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including the defendant's character; physical and mental

condition; family and community ties; past conduct; history relating to drug or alcohol abuse; criminal history; and record concerning appearance at court; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. As stated, Mr. Johnson's crimes were severe. Powerful evidence of guilt prompted his plea. Nevertheless, as discussed above, Mr. Johnson's characteristics today support relief. Mr. Johnson has submitted a robust reentry plan with plans in place for mental health, vocational, social, and housing support. Probation has checked out this plan. Mr. Johnson's current low level of threat to the community favors release.

*Sixth*, the remaining sentences available are the BOP and home confinement. For the reasons stated above, the low risk that Mr. Johnson poses, further mitigated by the watchful eye of the United States Probation Department, tips this factor toward relief.

*Seventh*, the guidelines range for Mr. Johnson's convictions was 360 months to life, he received 276 months, and this changed sentence would amount to approximately 200 months, a downward departure (PSR ¶ 161). This factor appears neutral.

The balance of the above factors warrants a reduction in sentence at this time. The motion for compassionate release is **GRANTED**. Good cause being shown to protect sensitive and third-party information, the motions to seal are **GRANTED** (Dkt. Nos. 2040, 2046).

**IT IS SO ORDERED.**

Dated: October 30, 2021.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE